UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                         Case No.  14-cr-20677
                                            Hon. Matthew F. Leitman

v.

ANTONIO AMAR FULLER,

      Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (ECF #14)

On October 11, 2014, Defendant Antonio Fuller ("Fuller") was walking alongside a road in Superior Township when two Washtenaw County Sheriff Deputies stopped him for questioning.  The deputies were seeking to execute an outstanding arrest warrant against a man named Gerald Warlix ("Warlix"), and one of the deputies mistakenly believed that Fuller was Warlix.  Fuller informed the deputies that he was not Warlix and produced identification confirming that fact.  Nonetheless, the deputies continued to detain Fuller in order to check whether there were any outstanding warrants for Fuller.  While one of the deputies conducted the warrant check, the other deputy approached Fuller to perform a pat down search.  Fuller stated that he did not consent to being patted down, and when the deputy touched Fuller's arm, Fuller fled on foot.  The deputies eventually

1

caught Fuller, subdued him, and found a loaded handgun in Fuller's pocket. Because Fuller had previously been convicted of a felony, he was not permitted to possess the gun.

The government has charged Fuller with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  (*See* ECF #7.) Fuller has now moved to suppress all of the evidence seized from his person on October 11, 2014 (the "Motion to Suppress").  (*See* ECF #14.)  The Court concludes that the deputies had no lawful basis to continue detaining Fuller after they determined that he was not Warlix and that the evidence seized from Fuller was the fruit of the unlawful continued detention.  The Court further determines that suppression is the appropriate remedy for this Fourth Amendment violation. Accordingly, the Court **GRANTS** Fuller's Motion to Suppress.

## FACTUAL FINDINGS

The Court held evidentiary hearings on the Motion to Suppress on February 6 and March 9, 2015.  (*See* Hearing Transcript I, ECF #23, and Hearing Transcript II, ECF #24.)  Fuller was present for the hearing, but he did not testify.  Based on all of the evidence presented at the hearings, the Court makes the following factual findings:[1]

### A.    While Looking for Warlix, the Deputies Detained Fuller and Quickly Determined That He Was Not Warlix

1.     On the evening of October 11, 2014, Washtenaw County Sheriff Deputies Joseph Montgomery ("Deputy Montgomery") and Paul Corrie ("Deputy Corrie," collectively the "Deputies") were on patrol near MacArthur Boulevard and Wiard Boulevard in Superior Township, Michigan.  (*See* Tr. I at 7-10, 67; Pg. ID 132-35, 192.)   They were in full uniform and were driving a marked Washtenaw County Sheriff's vehicle. (*See id*. at 11-12, Pg. ID 136-37.)

2.     The Deputies were looking for a man named Gerald Warlix. (*See id.*) Warlix was a suspect in a stolen vehicle investigation, and a warrant had been issued for Warlix's arrest.  (*See id.*)

---

[1]   The Court provides supporting citations as examples of material in the record that supports the Court's findings.  By providing a specific citation, the Court does not mean to imply that the cited evidence is the sole support in the record for a particular finding.  The Court's findings are based upon the totality of the evidence presented at the two evidentiary hearings.

3.     Deputy Montgomery was familiar with Warlix because he had previously arrested Warlix on Wiard Boulevard. (*See id.* at 12-13, Pg. ID 137-38.)

4.     As Deputy Corrie drove the vehicle on Wiard Boulevard, Deputy Montgomery observed a black man walking along the side of the road. (*See id.* at 12, Pg. ID 137.)

5.     Deputy Montgomery thought that the pedestrian was Warlix. (*See id.* at 13, Pg. ID 138.) The pedestrian was the same race and approximately the same height, weight, and age as Warlix, and the pedestrian was walking in approximately the same area as Montgomery's prior interaction with Warlix. (*See id.* at 13, Pg. ID 138.)

6.     Deputy Montgomery told Deputy Corrie that he thought that the pedestrian was Warlix. (*See id.* at 14, Pg. ID 139.)

7.     The pedestrian was not Warlix; he was Fuller. (*See id.* at 19, Pg. ID 144.)

8.     Deputy Corrie pulled the vehicle to the side of the road and parked the vehicle in front of Fuller. (*See id.* at 14-15, Pg. ID 139-40.) Deputy Montgomery then exited the vehicle, approached Fuller, and began speaking to him. (*See id.* at 15, Pg. ID 140.)

4

9.     The manner in which Deputy Montgomery communicated with Fuller indicated to Fuller – from the very beginning of their encounter – that Fuller was *required* to engage with him (Deputy Montgomery).[2]  (*See id*. at 62, Pg. ID 187.)

10.    Deputy Montgomery addressed Fuller as "Gerald Warlix."  (*See id.* at 15, Pg. ID 140.)

11.    Fuller responded that he was not Warlix, and he identified himself as "Antonio Fuller."  (*See id.* at 15, Pg. ID 140.)

12.    Deputy Montgomery, who had been joined by Deputy Corrie on the side of Wiard Boulevard, asked Fuller to produce identification.  (*See id.* at 16-17, Pg. ID 141-42.)

13.     Fuller handed Deputy Montgomery his identification, and Deputy Montgomery reviewed the identification. (*See id.* at 18-19, Pg. ID 143-44.)  The identification indicated to Deputy Montgomery that the person to whom he was speaking was Fuller.  (*See id.*)

14.    As soon as Deputy Montgomery completed his review of Fuller's identification, he was satisfied that person with whom he was speaking was Fuller and was *not* Warlix.  (*See id.*; *see also id.* at 45, Pg. ID 170.)  At that point, Deputy Montgomery had completed the task that he set out to accomplish when he initiated the stop.

---

[2]   Deputy Montgomery acknowledged this precise fact during the evidentiary hearing before the Court.  (*See id*. at 62, Pg. ID 187.)

15.     Deputy Corrie heard Fuller identify himself as Fuller and not Warlix. (*See id.* at 74-75, Pg. ID 199-200.)   Deputy Corrie was also satisfied that the person with whom Deputy Montgomery was speaking was Fuller and *not* Warlix. (*See id.*; *see also id.* at 95, Pg. ID 220.)   Deputy Corrie had never met Fuller and was not familiar with Fuller's name.  (*See id.* at 74, Pg. ID 199.)

**B.     Deputy Montgomery Recognized Fuller's Name Because One Year Earlier Deputy Montgomery Had Investigated Assault Allegations Against Fuller. But at the Time the Deputies Stopped Fuller, Deputy Montgomery Did Not Know Whether Fuller Had Ever Been Charged for the Alleged Assault**

16.     Deputy Montgomery recognized Fuller's name.  (*See id.* at 18, Pg. ID 143.)  Deputy Montgomery recalled that he had been the officer in charge of an investigation in which Fuller had been a suspect.  (*See id.* at 19, Pg. ID 144.)

17.     Specifically, Deputy Montgomery remembered that in November 2013, he received a complaint that Fuller had physically assaulted a young man during a game of pick-up basketball (the "November 2013 Incident").  (*See id.* at 21-22, Pg. ID 146-47.)   The complaint also alleged that Fuller threatened the young man by wielding a knife and lifting up his shirt to reveal a handgun in the waistband of his pants.  (*See id.*)   Deputy Montgomery took the statements of witnesses and submitted a report about the November 2013 Incident to the Washtenaw County Prosecuting Attorney (the "Prosecuting Attorney").  (*See id.* at 22, Pg. ID 147.)

6

18.     By March 2014, the Prosecuting Attorney still had not issued any charges against Fuller in connection with the November 2013 Incident.   That month, the Prosecuting Attorney asked Deputy Montgomery to conduct additional investigative work on the case.   Specifically, the Prosecuting Attorney directed Deputy Montgomery to contact the alleged victim and obtain a better description of the knife that Fuller allegedly brandished.  (*See id.* at 24, Pg. ID 149.)

19.     The March 2014 request from the Prosecuting Attorney – asking Deputy Montgomery to gather additional information – was the last thing that Deputy Montgomery recalled hearing from the Prosecuting Attorney about the November 2013 Incident.  (*See id.* at 46, Pg. ID 171.)

**C.    Even Though Deputy Montgomery Had No Idea Whether Fuller Had Been Charged With Any Crime Nor Whether There Was an Outstanding Warrant for Fuller, Deputy Montgomery Decided to Continue to Detain Fuller to Run a Warrant Check**

20.    As Deputy Montgomery spoke to Fuller on the side of Wiard Boulevard on October 11, 2014, Deputy Montgomery had no idea whether Fuller had been charged with any crime in connection with the November 2013 Incident.[3] (*See* Tr. II at 17, Pg. ID 288.)  In fact, Deputy Montgomery asked Fuller about the status of the investigation because he (Deputy Montgomery) did not know whether there was an outstanding warrant for Fuller.  (*See* Tr. I at 25, Pg. ID 150; *see also* Tr. II at 28, Pg. ID 299.)

21.    Deputy Montgomery nonetheless decided to continue to detain, and did continue to detain, Fuller in order to check whether Fuller had an outstanding arrest warrant.  (*See* Tr. I at 49, Pg. ID 174; *see also id.* at 44, Pg. ID 169 ("he's not free to leave until I determine [whether] he has a warrant").)

---

[3]  It turns out that in April 2014, the Prosecuting Attorney did bring an assault and battery charge against Fuller in connection with the November 2013 Incident. (*See* Tr. II at 20-21, Pg. ID 291-92.)  Deputy Montgomery had been identified as the officer in charge of that case (*see id.* at 18, Pg. ID 289), but he did not recall that fact (nor did he recall the criminal charges) as he spoke to Fuller on the side of Wiard Boulevard in October 2014.  (*See id.* at 17, Pg. ID 288.)  Notably, the criminal charges against Fuller had been *dismissed* several months *before* Deputy Montgomery encountered Fuller in October of 2014.  (*See id.* at 24, Pg. ID 295.)  Additional facts concerning the criminal charges that were filed against Fuller and their significance to this motion are discussed below in Part C.

22.     At the time Deputy Montgomery decided to conduct the warrant check, he did not affirmatively believe that there was an outstanding warrant for Fuller; he simply did not know whether Fuller was the subject of an outstanding warrant.[4]  (*See, e.g.*, Tr. I at 24, 46, 49; Pg. ID 149, 171, 174; *see also* Tr. II at 26, 28-29, Pg. ID 297, 299-300.)

23.     At the point Deputy Montgomery decided to continue his detention of Fuller to run the warrant check, the Deputies had no reason to believe that Fuller had committed any criminal conduct on the day of the encounter – i.e., on October 11, 2014.  (*See id.* at 49, 95; Pg. ID 174, 220.)  Fuller's behavior during the encounter did not make the Deputies suspicious that Fuller was engaged in criminal activity. (*See id.*)

24.     Moreover, Fuller complied with all of Deputy Montgomery's instructions up to the point that Deputy Montgomery decided to run the warrant check.  (*See id.*)

---

[4]  At one point during the evidentiary hearings, Deputy Montgomery testified that he "actually did believe that there was a warrant out for [Fuller's] arrest." (Tr. I at 43, Pg. ID 168.)  The Court declines to credit this testimony.  Instead, the Court credits Deputy Montgomery's repeated acknowledgment that he "did [not] know one way or the other whether an arrest warrant had been issued" (*id.* at 24, Pg. ID 149); that he "didn't know whether or not there was any warrant" (*id.* at 46, Pg. ID 171); that he "d[id] not know if there [wa]s a warrant" (*id.* at 49, Pg. ID 174); and that he "didn't know whether … a warrant was outstanding" (Tr. II at 26 Pg. ID 297).

**D.**     **Deputy Montgomery Began to Conduct a Pat Down Search of Fuller, Fuller Fled on Foot, and the Deputies Caught and Arrested Him**

25.     Deputy Montgomery handed Fuller's identification to Deputy Corrie so that Deputy Corrie could run the warrant check.  (*See* Tr. I at 18, Pg. ID 143.)

26.     While Deputy Corrie began running the warrant check, Deputy Montgomery informed Fuller that he was going to conduct a pat down for weapons.  (*See id.* at 25, Pg. ID 150.)  Based on his recollection of the allegations about the November 2013 Incident, Deputy Montgomery thought it was possible that Fuller might be carrying a weapon at the time of their encounter on Wiard Boulevard.  (*Id.*)

27.     Fuller then backed away from Deputy Montgomery, looked to his left and right, and extended his hands in front of himself.  (*See id.*)

28.     Deputy Montgomery became concerned that Fuller was going to either fight or flee.  (*Id.*)

29.     Deputy Montgomery instructed Fuller to relax, and he moved around to Fuller's side.  (*See id.*)  Deputy Montgomery then placed one of his hands on Fuller's shoulder and one hand on Fuller's elbow in order to calm Fuller down.  (*See id.* at 26, Pg. ID 151.)

30.     Fuller informed Deputy Montgomery that he did not consent to being searched.  (*See id.*)

10

31.     Fuller then broke free from Deputy Montgomery's grip and began running down Wiard Boulevard.  (*See id.* at 26-27, Pg. ID 151-52.)

32.     Deputy Montgomery yelled to Deputy Corrie that Fuller was fleeing, and both Deputies pursued Fuller on foot.  (*See id.* at 27, Pg. ID 152.)  Deputy Corrie commanded Fuller to stop, but Fuller continued running.  (*See id.* at 28, Pg. ID 153.)  Deputy Corrie ultimately caught up to Fuller and tackled him to the ground.  (*See id.* at 29, Pg. ID 154.)  Deputy Montgomery handcuffed Fuller while Fuller was laying face-down on the ground.  (*See id.* at 30, Pg. ID 155.)

33.     Deputy Montgomery then conducted a pat down of Fuller and found a loaded handgun in Fuller's back pocket.  (*See id.*)  Deputy Montgomery placed Fuller under arrest.  (*See id.* at 31, Pg. ID 156.)

34.     The Deputies escorted Fuller back to their patrol vehicle.  (*See id*.)  Once the Deputies secured Fuller in the patrol vehicle, Deputy Montgomery finished running the warrant check on Fuller and determined that there was no outstanding warrant for Fuller.  (*See id.* at 31-32, Pg. ID 156-57.)

## ANALYSIS

Fuller now seeks suppression of the evidence seized from him on the ground that the evidence was the fruit of his unlawful detention. For the reasons explained below, the Court concludes that suppression of the evidence is warranted.

**A.    Fuller Was Seized Immediately When Deputy Montgomery Began Questioning Him**

The Fourth Amendment prohibits "unreasonable searches and seizures" by government officials. U.S. CONST. Amend. IV. A person is seized within the meaning of the Fourth Amendment when a government official, "by means of physical force or show of authority, has in some way restrained [his] liberty." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). The test for whether a seizure has occurred is whether "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 438 (1991). "In addition, an individual must actually submit to the show of authority to be seized within the Fourth Amendment." *United States v. Williams*, 615 F.3d 657, 663 (6th Cir. 2010).

The Government contends that the encounter between Fuller and Deputy Montgomery was a purely consensual one, not a seizure. (*See* ECF #26 at 14-18; Pg. ID 364-68.) But Deputy Montgomery's own testimony belies that argument. Deputy Montgomery never testified that the encounter was consensual; that Fuller could have chosen not to respond to his questions; nor that Fuller was free to leave at any time. On the contrary, Deputy Montgomery repeatedly testified that Fuller was *not* free to leave. (*See* Tr. I at 44, 48-49, 65; Pg. ID 169, 173-74, 190.)

More importantly, while Deputy Montgomery testified that his initial encounter with Fuller was "cooperative" (*Id.* at 18, Pg. ID 143), he expressly conceded – and the Court finds as a matter of fact – that "the manner in which [Deputy Montgomery] initially communicated with Fuller" indicated to Fuller that Fuller was "*required* to engage" with him. (*Id.* at 62, Pg. ID 187; emphasis added.) Deputy Montgomery did not merely ask Fuller if he was "willing to answer some questions," *Florida v. Royer*, 460 U.S. 491, 497 (1983) (no seizure if officer asks person if he will answer questions); instead, as Deputy Montgomery admitted, his words, tone, and actions – "the manner in which [he] communicated with Fuller" – conveyed to Fuller that Fuller was *obligated* to stop and speak with him. Accordingly, a reasonable person in Fuller's position would have believed that he was not free to leave. *See Mendenhall*, 446 U.S. at 554 (a seizure occurs where an officer uses "language or a tone of voice indicating that compliance with

13

the officer's request might be compelled.")  Indeed, the Government has not cited a single case in which any court has found a citizen-officer encounter to have been consensual where, as here, the officer admitted that the citizen was not free to leave and admitted that his manner of communication conveyed that fact to the citizen.[5]

The Government counters that Deputy Montgomery's testimony merely revealed his subjective intent concerning whether Fuller was free to leave and that his intent is irrelevant to a proper seizure analysis.  (*See* ECF #26 at 16-17, Pg. ID 366-67.)  While it is generally true that an officer's subjective intent in detaining an individual is not relevant to the Fourth Amendment seizure analysis, *see United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007), the subjective intent of an officer *is* relevant "to the extent that intent has been conveyed to the person confronted."  *United States v. Rose*, 889 F.2d 1490, 1493 (6th Cir. 1989).  Here,

---

[5]   The Government compares the interaction between Deputy Montgomery and Fuller to the citizen-police encounters found to be consensual in *United States v. Carr*, 674 F.3d 570, 573-74 (6th Cir. 2012) and *United States v. Campbell*, 486 F.3d 949, 956-57 (6th Cir. 2007).  (*See* ECF #26 at 16-18, Pg. ID 366-368.)  But those cases are distinguishable.  In *Carr*, the Sixth Circuit noted that the officers did not communicate to the citizen in a tone or manner that conveyed that compliance was required.  *See Carr*, 674 F.3d at 574.  In *Campbell*, the officer first inquired if the citizen was "okay" – a question that implies concern for the citizen's welfare and that would tend to put a citizen at ease rather than cause the citizen to believe he was not free to leave – and then told the citizen that he would "like" to see the citizen's identification "just to log that I talked to him." *Campbell*, 486 F.3d at 952, 956.

14

Deputy Montgomery not only subjectively intended to detain Fuller, but he also conveyed that intention to Fuller:

> THE COURT: … [I]s it fair to say that your – the manner in which you communicated with Mr. Fuller from the beginning *indicated to him* that he was *required to engage with you*?
>
> DEPUTY MONTGOMERY:  Yes, your Honor.

(Tr. I at 62, Pg. ID 187; emphasis added.)  Because Fuller submitted to Deputy Montgomery as "required" when the questioning began, Fuller was seized under the Fourth Amendment from that point forward.

**B.     The First Portion of the Seizure – to Determine Whether Fuller was Warlix – Was Lawful Because It Was Supported by Reasonable Suspicion**

The Fourth Amendment permits a law enforcement officer to conduct a temporary investigatory seizure – known as a *Terry* stop – if the officer "reasonably suspects that the person apprehended is committing or has committed a criminal offense." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009).  More than an "inchoate and unparticularized suspicion or 'hunch'" is needed to justify a *Terry* stop.  *Terry*, 392 U.S. at 27.  Rather, the officer must have a "reasonable suspicion" of criminal activity based on "specific and articulable facts."  *Id.*

Deputy Montgomery had reasonable suspicion to stop Fuller for the sole purpose of determining whether he was Warlix.  The Deputies were actively looking for Warlix because he was a suspect in a stolen vehicle investigation, and

15

there was an outstanding warrant for Warlix's arrest.  (*See* Tr. I at 12, Pg. ID 137.)

Deputy Montgomery was familiar with Warlix because he had previously arrested

Warlix on Wiard Boulevard.   (*See id.* at 12-13, Pg. ID 137-38.)   Deputy

Montgomery believed that Fuller was Warlix because Fuller was the same race and

approximately the same height, weight, and age as Warlix, and because Fuller was

walking in approximately the same area as Deputy Montgomery's prior interaction

with Warlix.   (See id. at 13, Pg. ID 138.)   Under these circumstances, Deputy

Montgomery had a reasonable, articulable suspicion that Fuller was Warlix and

that Warlix had engaged in criminal activity.  Deputy Montgomery's initial seizure

of Fuller was therefore justified.  *Cf. United States v. Tellez*, 11 F.3d 530, 532-33

(5th Cir. 1993) (police officer had reasonable suspicion justifying *Terry* stop where

officer knew that there was an outstanding warrant for the defendant's arrest).

## C.   Deputy Montgomery's Continued Detention of Fuller – After He Determined that Fuller Was Not Warlix – Was Unlawful

### 1.   An Officer May Not Extend a Seizure to Conduct Additional Investigation After the Officer's Reasonable Suspicion is Dispelled

"The Fourth Amendment allows police to detain a suspect on reasonable

suspicion only for as long as it takes for the police to test the validity of their

suspicions."  *United States v. Davis*, 430 F.3d 345, 357 (6th Cir. 2005).  "Officers

may not detain citizens once their suspicions, however reasonable initially, have

been dispelled."  *Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477

F.3d 807, 829 (6th Cir. 2007).  Accordingly, "once … any underlying reasonable suspicion [is] dispelled, the … detention generally must end without undue delay." *United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006).  More specifically, an officer may not extend an investigatory stop in order to obtain additional information about an individual – such as by requesting/reviewing paperwork or running a warrant check – after the officer's reasonable suspicion for the stop has been dispelled.[6]  A line of cases from the United States Court of Appeals for the Tenth Circuit provides a particularly helpful example of this rule in practice.

In *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994), the Tenth Circuit held that an officer could not continue to detain a motorist to check the motorist's license and criminal history after the officer's reasonable suspicion that the motorist committed a traffic violation had been dispelled.  In that case, Utah Highway Patrol Trooper Dennis Avery ("Trooper Avery") stopped a vehicle driving with what he believed to be a partially-obstructed registration sticker.  As Trooper Avery approached the vehicle, he observed that the vehicle's sticker was, in fact, not obstructed and that the sticker was valid and not expired.  Nonetheless, Trooper Avery detained the driver to review his license and to conduct a criminal

---

[6]  However, an officer may continue a detention if something that occurred during the stop – and before the initial reasonable suspicion dissipated – gives the officer additional reasonable suspicion.  *See, e.g., United States v. Bailey*, 302 F.3d 652, 657-58 (6th Cir. 2002).

history check, which revealed that the driver had a suspended driver's license and a lengthy criminal record. Trooper Avery then obtained the driver's consent to search the vehicle and found a gun and a bag containing cocaine. The driver was charged with several offenses, and he moved to suppress the gun and cocaine on the ground that they were the fruit of an unlawful detention. The Tenth Circuit agreed:

> Trooper Avery's reasonable suspicion regarding the validity of [the driver's] temporary registration sticker was completely dispelled *prior* to the time he questioned [the driver] and requested documentation. Having no objectively reasonable articulable suspicion that illegal activity had occurred or was occurring, Trooper Avery's actions in questioning [the driver] and requesting his license and registration exceeded the limits of a lawful investigative detention and violated the Fourth Amendment.

*Id.* at 561-62 (internal citations and punctuation omitted).

The Tenth Circuit reached a similar conclusion in *Edgerton*, *supra*. In that case, Kansas State Trooper Andrew Dean ("Trooper Dean") stopped a vehicle because he could not read its registration tag and believed the tag was obstructed in violation of Kansas law. When Trooper Dean approached the vehicle, he determined that the tag was not obstructed and that it had appeared unreadable only because it was dark outside. Trooper Dean was able to read the tag by shining his flashlight on it, and he determined it was valid. Nonetheless, Trooper Dean continued to detain the driver and asked for her license and registration. Trooper

18

Dean then obtained the driver's permission to search the vehicle, in which he ultimately found cocaine.  The Tenth Circuit held that the driver's continued detention even after Trooper Dean was able to discern the validity of the registration tag was unlawful:

> Once Trooper Dean was able to read the … tag and deem it unremarkable, any suspicion that [the driver] had violated [Kansas law] dissipated because the tag was … "in a place and position to be clearly visible."  At that point, *McSwain* instructs us for better or worse that Trooper Dean, as a matter of courtesy, should have explained to [the driver] the reason for the initial stop and then allowed her to continue on her way without requiring her to produce her license and registration.

*Edgerton*, 438 F.3d at 1051.[7]

In contrast, when an officer detains a suspect based on reasonable suspicion and that reasonable suspicion is *not* dispelled during the stop, the officer *may* run a warrant check during the stop.  That is exactly the distinction that the Tenth Circuit drew in *United States v. Lyons*, 510 F.3d 1225 (10th Cir. 2007).  In that case, Kansas Highway Patrol Trooper Jarett Ranieri ("Trooper Ranieri") stopped a

---

[7] *See also State v. Diaz*, 850 So.2d 435 (Fla. 2003) (reversing conviction for driving with a suspended license where officer detained defendant and requested his license after the officer dispelled his suspicion that the defendant's vehicle's tags were expired); *People v. Redinger*, 906 P.2d 81, 86 (Colo. 1995) (suppressing evidence where officer detained defendant and asked for information after officer dispelled his suspicion that the defendant's vehicle lacked a license plate or temporary registration plate); *State v. Chatton*, 463 N.E.2d 1237, 1240 (Ohio 1984) (suppressing evidence where "officer, having detained [defendant] for a suspected traffic violation, continued to … detain [defendant] for the purpose of determining the validity of [defendant's] driver's license once the officer no longer had reason to suspect that [defendant] was committing any traffic violation").

vehicle that he witnessed driving with an illegible license plate. As Trooper Ranieri approached the vehicle, he confirmed that the expiration tag on the license plate was illegible. Trooper Ranieri requested the driver's license, checked the driver's criminal history, and learned that the driver had prior drug offenses. Trooper Ranieri obtained the driver's consent to search the vehicle and ultimately discovered a large quantity of cocaine. The driver was charged with multiple drug-related offenses, and he moved to suppress the cocaine on the ground that his detention for the purpose of running a criminal history check was unlawful. Distinguishing *McSwain* and *Edgerton*, the Tenth Circuit held that because Trooper Ranieri's reasonable suspicion that the driver had violated Kansas law was not dispelled during the stop, Trooper Ranieri was permitted to check the driver's criminal history during the stop:

> The officers in *McSwain* and *Edgerton* were justified in stopping the defendant's vehicle based on a reasonable suspicion that a traffic violation was occurring but that suspicion evaporated once they observed no violation had occurred. Once their suspicion evaporated, the officers had no reason to continue to detain the vehicle or its occupants and therefore their subsequent actions (requesting the drivers' documents, running a criminal history check, inquiring about travel plans and seeking consent to search) were unlawful. This case stands in sharp contrast. Ranieri's suspicion for stopping [the] vehicle (illegible expiration tag) did not evaporate, but was confirmed, once he stopped [the] vehicle. Therefore, Ranieri's detention of [the driver] while performing a [criminal history] check … did not violate the Fourth Amendment.

*Id.* at 1236.  This line of Tenth Circuit helpfully illustrates a clear distinction: an officer may run a warrant check during a lawful *Terry* stop if his reasonable suspicion supporting the stop has not yet evaporated, but once the officer's reasonable suspicion has been dispelled, the officer may not continue to detain the suspect – even for a short time[8] – to run such a check.

The decisions of the United States Court of Appeals for the Sixth Circuit are consistent with this distinction.  For instance, in *United States v. Young*, 707 F.3d 598 (6th Cir. 2012), the Sixth Circuit upheld an officer's decision to run a warrant check during the course of a valid *Terry* stop, but the reasonable suspicion supporting the stop had *not* evaporated when the officer conducted the check.  The officer in *Young* stopped the suspect based on reasonable suspicion that the suspect was trespassing and/or loitering.  *See id*. at 603-05.  At the beginning of the stop, the officer obtained the suspect's license and commenced a warrant check.  *See id*. at 605.  Later in the stop, the suspect offered an explanation for his presence on the property in question that, if accepted, could potentially have dispelled the officer's suspicion that the suspect's presence was unlawful.  *See id*.  The Sixth Circuit said that it had no need to consider the veracity and/or sufficiency of that explanation

---

[8]   *Cf.*, *United States v. Lopez*, 443 F.3d 1280, 1285-86 (10th Cir. 2006) (five-minute detention to check for warrant unreasonable where officer lacked reasonable suspicion for stop); *Royer*, 460 U.S. at 498 (an individual "may not be detained *even momentarily* without reasonable, objective grounds for doing so") (emphasis added).

because the officer had *already* started the warrant check *before* the suspect

offered the explanation.  *See id.*   Thus, the warrant check commenced while

reasonable suspicion remained intact.

In contrast, in *Davis, supra* (which arose in a different context), the Sixth

Circuit held that officers violated the Fourth Amendment when they continued to

detain the defendant to investigate possible drug trafficking even after a drug-

sniffing dog failed to alert to the presence of narcotics, thereby dispelling the

officers' reasonable suspicion:

> Once the drug-sniffing dog was brought to the scene and failed
> to alert positively to the presence of narcotics in the vehicle, the
> officers' suspicions that Davis was in possession of narcotics
> were dispelled….   Given that the police had no reason to
> continue to suspect that Davis possessed narcotics, delaying
> Davis' vehicle an additional hour in order to permit a second
> examination of the vehicle … was unreasonable…. [T]o delay
> Davis another hour in order to permit a second search of the
> vehicle simply delayed the release of Davis and his vehicle
> without any investigatory purpose.  Such a delay is specifically
> prohibited by the Fourth Amendment.

*Davis*, 430 F.3d at 356 (internal citations omitted).[9]  Likewise, in *United States v.*

*Gross*, 662 F.3d 393 (6th Cir. 2011), the Sixth Circuit disapproved of a police

officer's decision to "continue to detain [a suspect] in order to run a warrant

---

[9] *See also Center for Bio-Ethical Reform*, 477 F.3d at 829 (finding a Fourth
Amendment violation where local law enforcement officers detained suspects for
an investigation by FBI officers, even after the local law enforcement officers'
initial investigation dispelled their suspicions that the suspects were engaged in
criminal activity).

check" where the suspect did not behave suspiciously during the stop and where the officer had "no reasonable grounds to suspect that there might be an outstanding warrant…."[10]  This Court is not aware of any case in which the Sixth Circuit has permitted police officers to continue to detain a suspect for the purpose of running a warrant check after reasonable suspicion for stopping the suspect has evaporated.

In sum, the cases from the Tenth Circuit, the Sixth Circuit, and the highest courts of Florida, Colorado, and Ohio (*see* n. 7, *supra*) firmly establish that as soon as an officer's reasonable suspicion for a stop is dispelled, the officer may not further detain a suspect in order to obtain additional information through a warrant check or records review.  The Court now applies this principle to the case at hand.

### 2. Deputy Montgomery's Continued Detention of Fuller in Order to Run a Warrant Check Was Unlawful Because Deputy Montgomery's Reasonable Suspicion Was Dispelled As Soon as He Realized that Fuller Was Not Warlix

Deputy Montgomery's reasonable suspicion for stopping Fuller – i.e., his suspicion that Fuller was Warlix – was completely dispelled as soon as Deputy Montgomery finished his review of Fuller's identification.  (*See* Tr. I at 18-19, 45;

---

[10]  *Gross* is not exactly on point because it is not a case in which officers initially made a lawful stop that was supported by reasonable suspicion and then continued to detain the defendant once that suspicion evaporated.  Instead, the stop was unlawful from its inception.  But *Gross* nonetheless casts serious doubt on the lawfulness of Deputy Montgomery's continued detention of Fuller in order to run the warrant check.

Pg. ID 143-44, 170.)   At that point, Deputy Montgomery understood that the person to whom he was speaking was *not* Warlix. (*See id.*)

Once Deputy Montgomery's reasonable suspicion was dispelled, Deputy Montgomery had no objectively reasonable basis to continue to detain Fuller. Indeed, Deputy Montgomery admits that he did not suspect that Fuller had committed a crime that day.  And Deputy Montgomery also admits that, prior to his decision to extend the stop to conduct the warrant check, Fuller did not behave suspiciously.   Accordingly, as soon as Deputy Montgomery realized that Fuller was not Warlix, the detention had to end.  *See Edgerton,* 438 F.3d at 1047 (once underlying suspicion is dispelled, detention "must end without undue delay").

The Government insists that Deputy Montgomery did have reasonable suspicion to justify his continued detention of Fuller.  The Government argues that when Fuller identified himself, Deputy Montgomery remembered Fuller as the suspect from the November 2013 Incident and reasonably believed that Fuller had an outstanding warrant arising out of that incident.  (*See* ECF #26 at 23, Pg. ID 373.)   Thus, the Government contends, Deputy Montgomery had reasonable suspicion to continue detaining Fuller in order to conduct a warrant check.  (*See id.*)

The Government's argument is flawed in two critical respects.  First, as the Court found as a matter of fact, Deputy Montgomery did *not* affirmatively believe

that there was a warrant for Fuller's arrest. On the contrary, Deputy Montgomery had no idea whether there was such a warrant (*see, e.g.*, Tr. II at 26, Pg. ID 297); he simply wondered whether Fuller may be the subject of a warrant. Deputy Montgomery did not even have the sort of "hunch" that, itself, falls short of reasonable suspicion. *See Terry*, 392 U.S. at 27 (reasonable suspicion requires more than an "inchoate and unparticularized suspicion or 'hunch'").

Second, even if Deputy Montgomery had believed that there was a warrant for Fuller, such a belief would have been pure speculation. As Deputy Montgomery spoke to Fuller, he remembered the following: that (1) in November of 2013 (nearly one year earlier), he took a report from a person who claimed that Fuller committed an assault and brandished a knife; (2) he submitted an incident report to the Prosecuting Attorney around that same time; (3) around March of 2014, the Prosecuting Attorney asked him to complete additional investigative work, and he did so; and (4) he had not heard anything about the matter in the roughly six months since March of 2014. (*See* Tr. I at 19-24, Pg. ID 144-49.) For all Deputy Montgomery knew, the Fuller matter could have gone many different directions in the six months since Deputy Montgomery completed his follow-up work. As set forth in the table below, many of those directions would not have resulted in an outstanding warrant for Fuller at the time Deputy Montgomery stopped him on Wiard Boulevard:

| Possible Status of Fuller Matter Based on Deputy Montgomery's Knowledge as of October 2014 | Warrant Status |
|---|---|
| Prosecuting Attorney declined to charge Fuller after reviewing additional information requested from Deputy Montgomery | No warrant |
| Prosecuting Attorney charged Fuller with offense; Fuller appeared for proceedings; and proceedings not yet concluded | No warrant |
| Prosecuting Attorney charged Fuller; Fuller appeared for proceedings; proceedings concluded through conviction; and sentence completed (or, if probationary sentence, in process of being served) | No warrant |
| Prosecuting Attorney charged Fuller, and Fuller was acquitted of charges | No warrant |
| Prosecuting Attorney charged Fuller and sent warrant to Washtenaw County Sheriff's office where it sat unserved for months | Warrant |
| Prosecuting Attorney charged Fuller and Fuller failed to appear for proceedings | Warrant |

As he stood speaking with Fuller, Deputy Montgomery could only have guessed as to which path the Fuller matter had taken. Deputy Montgomery had no *reasoned* basis on which to conclude that the matter had proceeded down one of the paths that would have resulted in an outstanding warrant. Indeed, he had at least some reason to *doubt* that a warrant had ever been issued. Deputy Montgomery recalled that the Prosecuting Attorney did *not* file charges against

26

Fuller based upon his initial report and, instead, insisted upon evaluating additional evidence before deciding whether to charge.  Against this background, any belief by Deputy Montgomery that there was an outstanding warrant for Fuller would have been mere speculation and would have fallen far short of reasonable suspicion.

That is exactly what the Sixth Circuit concluded in *Williams*, *supra*.  In that case, Columbus Police Department Officer Robert Vass ("Officer Vass") detained a suspect whom he believed to be trespassing.  Officer Vass had previously arrested the suspect for an unrelated infraction.  Officer Vass asked the suspect whether he had any outstanding warrants, and the suspect admitted that "there might be one."  Officer Vass then patted down the suspect and discovered a gun. The district court granted the suspect's motion to suppress the gun on the ground that Officer Vass lacked reasonable suspicion to detain the suspect.  On appeal, the government argued that even if Officer Vass lacked reasonable suspicion that the suspect was trespassing, the seizure was nonetheless justified because Officer Vass had reasonable suspicion that the suspect had an outstanding warrant.  The Sixth Circuit affirmed the suppression of the gun.  The Sixth Circuit held that Officer Vass' speculation that there may have been a warrant for the suspect – "based solely on the fact that [the suspect] previously had been charged with a crime" – did not amount to reasonable suspicion:

> [Officer] Vass's subjective suspicion that [the suspect] might be
> wanted on a warrant was a mere hunch. The fact that a person
> has previously been arrested cannot provide objective
> reasonable suspicion that he missed a court appearance;
> otherwise, officers could detain anyone they know to have
> pending criminal charges.

*Williams*, 615 F.3d at 667 & 669. Deputy Montgomery's conjecture that Fuller

had an outstanding warrant was even more speculative than in *Williams*, as Deputy

Montgomery did not even know whether criminal charges had been filed against

Fuller. As the Sixth Circuit stated in *Williams*, such "guesswork is not remotely

enough for reasonable suspicion." *Id.* at 667.

The Government counters that based on Deputy Montgomery's experience

with the Washtenaw County criminal justice system, he reasonably could have

believed that there was a warrant for Fuller in October of 2014. Specifically, the

Government notes that Deputy Montgomery testified that, in his experience, (1) it

was not uncommon for there to be a delay between the submission of an officer's

report and charges being filed, and (2) authorities did not always actively seek to

execute outstanding warrants. (*See* ECF #26 at 23, Pg. ID 372 (citing Tr. I at 22-

24, 56-58; Pg. ID 147-49, 181-83).) Thus, the Government insists, Deputy

Montgomery could reasonably have believed that there was an unexecuted warrant

for Fuller. This argument is unavailing. Notwithstanding Deputy Montgomery's

understanding of the system, he had no reasoned basis on which to conclude that

Fuller had ever been charged with a crime and no reasoned basis for drawing any

conclusions about the status of a possible warrant for Fuller (if one had ever issued). For all of the reasons explained above, Deputy Montgomery did not have reasonable suspicion to believe that there was a warrant for Fuller, and thus his continued detention of Fuller to run a warrant check was unlawful.

**D.    Deputy Montgomery's Attempt to Pat Down Fuller Was Unlawful Because It Was Not In Connection With a Lawful Detention**

"When an individual is subject to a lawful investigative detention, an officer may conduct a limited frisk or pat-down of that person for weapons if the officer has a reasonable suspicion of criminal activity and a reasonable belief that the suspect is armed and dangerous." *United States v. Brown*, 20 Fed. App'x 387, 388 (6th Cir. 2001) (citing *Terry*, 392 U.S. at 30); *see also United States v. Roach*, 958 F.2d 679, 682 (6th Cir. 1992). An officer may *not* conduct a pat down, however, if the officer does not have a lawful basis to detain the suspect. *See, e.g.*, *United States v. Corona*, 661 F.2d 805, 807 (9th Cir. 1981) ("In order to conduct a pat-down search, a police officer must be entitled to stop the person to be searched."); *see also United States v. Evans*, 947 F.Supp.2d 895, 900, 908 (E.D. Tenn. 2013) (suppressing evidence discovered during pat down where officers lacked reasonable suspicion that defendant had committed a crime). Deputy Montgomery's attempt to pat down Fuller was impermissible because his reasonable suspicion to detain Fuller had previously evaporated. Thus, by the time

29

Deputy Montgomery began the attempted pat down, he had no lawful basis to continue to detain Fuller.

Deputy Montgomery testified that he needed to pat down Fuller in the interest of "officer safety." (*See* Tr. I at 25, Pg. ID 150.) But Deputy Montgomery became mindful of officer safety only *after* he realized that the person to whom he was speaking was Fuller and not Warlix – i.e., *after* his reasonable suspicion for the stop had been dispelled. (*See id.*) An officer may not create the circumstances necessitating a pat down by unlawfully detaining (or unlawfully continuing to detain) a suspect without reasonable suspicion. *Cf. Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015) (recognizing that officer safety does not justify search when officer's investigation into other crimes "detours" from purpose of initial stop). Because Deputy Montgomery lacked a reasonable basis to continue detaining Fuller, Deputy Montgomery could not lawfully search Fuller on the ground that during the continued detention Fuller posed a potential threat to officer safety.

## E. Evidence Seized After Fuller's Flight Was Fruit of the Poisonous Tree

"The 'fruit of the poisonous tree' doctrine … bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure." *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008). However, evidence obtained following an unlawful search is not the fruit of the poisonous

tree if its discovery results from "an intervening independent act of a free will sufficient to purge the primary taint of the unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 486 (1963). To assess whether evidence is fruit of the poisonous tree, a court must consider whether "the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstances so as to remove the 'taint' imposed upon the evidence by the original illegality." *United States v. Crews*, 445 U.S. 463, 471 (1980). The Supreme Court has identified three factors to guide this inquiry: (1) the amount of time between the illegality and the discovery of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the illegal conduct. *See Brown v. Illinois*, 422 U.S. 590, 603-04 (1975). "No single factor in this analysis is dispositive of attenuation." *United States v. Beauchamp*, 659 F.3d 560, 573 (6th Cir. 2011).

None of these factors, either individually or collectively, dissipates the taint of Deputy Montgomery's unlawful detention of Fuller. For the reasons discussed below, the evidence that the Deputies seized from Fuller is the fruit of the poisonous tree.

### 1. Amount of Time Between the Illegality and the Discovery of the Evidence

"There is no 'bright-line' test for temporal proximity." *United States v. Wolfe*, 166 Fed. App'x 228, 234 (6th Cir. 2006) (quoting *United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003)). However, Sixth Circuit has held that the

31

discovery of evidence was not attenuated from unlawful police conduct where only a few minutes passed between the conduct and the discovery. *See, e.g., United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir. 2003) (taint of illegal conduct not attenuated by lapse of 30 minutes); *United States v. Richardson*, 949 F.2d 851, 859 (6th Cir. 1991) (taint of illegal conduct not attenuated by lapse of 20 minutes).

Although the record is not clear on precisely how long Fuller's encounter with the Deputies lasted, the lapse of time between Fuller's unlawful detention and the Deputies' discovery of the evidence could not have been more than several minutes. That insignificant lapse of time was insufficient to attenuate the taint of Deputy Montgomery's unlawful conduct. *See Lopez-Arias* and *Richardson, supra.*

## 2.     Presence of Intervening Circumstances

"[T]he type of intervening events that serve to attenuate police misconduct are those that sever the causal connection between the illegal [seizure] and the discovery of the evidence." *United States v. Shaw*, 464 F.3d 615, 628-29 (6th Cir. 2006). The Government contends that Fuller's flight from the Deputies was an intervening circumstance that severed the causal connection between Deputy Montgomery's conduct and the discovery of the evidence. (*See* ECF #26 at 8-13, Pg. ID 358-63.) The Court disagrees.

The Government cites *United States v. Allen*, 619 F.3d 518 (6th Cir. 2010), in support of its argument. (*See id.* at 8, Pg. ID 358.) In *Allen*, the Sixth Circuit

explained that "if a suspect's response to an illegal stop is itself a new, distinct crime, then the police constitutionally may arrest the suspect for that crime." *Id.* at 525 (internal citation and punctuation omitted).  The Government also cites several unpublished Sixth Circuit cases for the same proposition.[11]  The Government insists that Fuller committed a new crime when he fled from the Deputies. Specifically, the Government contends that Fuller violated Mich. Comp. Laws § 750.81d(1), which prohibits an individual from "resist[ing], obstruct[ing], oppos[ing], or endanger[ing] a person who the individual knows or has reason to know is performing his or her duties."   Thus, the Government argues, even if Deputy Montgomery's continued detention of Fuller was unlawful, Fuller's flight violated M.C.L. § 750.81d(1) and therefore purged the taint of Deputy Montgomery's conduct.  (*See* ECF #26 at 8-13, Pg. ID 358-63.)

The Government's argument suffers from a fatal flaw: Fuller did *not* violate M.C.L. § 750.81d(1).  That provision prohibits an individual from resisting or obstructing only *lawful* police conduct.  *See, e.g.*, M.C.L. § 750.81d(7)(a) ("As used in this section … '[o]bstruct' includes the use or threatened use of physical

---

[11]   *See United States v. King*, 466 Fed. App'x 484 (6th Cir. 2012) (declining to suppress evidence where defendant's high-speed vehicular flight from allegedly-illegal stop gave officers probable cause to arrest him for new, independent crime); *United States v. Castillo*, 238 F.3d 424, 2000 WL 1800481 (6th Cir. Nov. 28, 2000) (unpublished) (same); *United States v. Jefferson*, 182 F.3d 919, 1999 WL 519298 (6th Cir. July 15, 1999) (unpublished) (declining to suppress evidence where defendant used force against officer while fleeing from allegedly-unlawful stop in violation of Tennessee law).

interference or force or a knowing failure to comply with a *lawful* command")
(emphasis added); *People v. Moreno*, 814 N.W.2d 624, 629 (Mich. 2012) (holding
that M.C.L. § 750.81d(1) "did not abrogate the [common-law] right to resist
unlawful police conduct"). Thus, an individual does not violate M.C.L. §
750.81d(1) when he resists or opposes *unlawful* police conduct. That is exactly
what Fuller did. As discussed above, Deputy Montgomery's continued detention
of Fuller was patently unlawful. Thus, Fuller's flight from the unlawful detention
was not a violation of M.C.L. § 750.81d(1).

The Government insists that even if Fuller did not actually violate M.C.L. §
750.81d(1), the Deputies had probable cause to believe that he did, and this
probable cause justified the Deputies' seizure of Fuller following his flight (and the
Deputies' ultimate discovery of the evidence).[12] (*See* ECF #26 at 5-8, Pg. ID 355-
58.) This argument also fails. The Deputies did not have probable cause to
suspect that Fuller violated M.C.L. § 750.81d(1). To the contrary, it should have
been obvious to them that they could not continue to detain Fuller after they
determined that Fuller was not Warlix. Indeed, as noted above, at the time the
Deputies stopped Fuller it was well-established that "[t]he Fourth Amendment
allows police to detain a suspect on reasonable suspicion only for as long as it

---

[12] "Probable cause exists if the facts and circumstances known to the officer
warrant a prudent man in believing that an offense has been committed." *Henry v.
United States*, 361 U.S. 98, 102 (1959).

34

takes for the police to test the validity of their suspicions." *Davis*, 430 F.3d at 357.

Under these circumstances, it would be too great a stretch to conclude that Fuller's

flight gave the Deputies probable cause to believe that Fuller resisted or obstructed

*lawful* police conduct.[13]   *See Hardy v. City of Milwaukee*, --- F.Supp.3d ---, 2015

WL 816998 at **16-24 (E.D. Wisc. 2015) (holding that officers did not have

probable cause to arrest a suspect who fled from an unlawful detention because the

detention was plainly unlawful and Wisconsin law prohibited resisting only lawful

police orders); *Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998)

(rejecting argument that officers had "arguable probable cause" to arrest suspect

for obstructing them where officers unlawfully detained suspect and Georgia law

prohibited only obstruction of lawful police conduct).

    This case differs from *Allen*, *King*, *Castillo*, and *Jefferson*, *supra* – the cases

in which the Sixth Circuit held that a defendant's flight following an unlawful

---

[13]   It should have been equally obvious to *both* Deputies that Fuller's continued
detention was unlawful and that Fuller's flight was not a crime.  Although Deputy
Montgomery led the Deputies' encounter with Fuller, Deputy Corrie heard Fuller
identify himself, and he was satisfied that the person they had stopped was Fuller
and *not* Warlix.  (*See* Tr. I at 74-75, Pg. ID 199-200.)  Deputy Corrie did not
recognize Fuller's name.  (*See id.*)  Deputy Corrie had absolutely no basis on
which to conclude that there was an outstanding warrant for Fuller.  Deputy Corrie
also had no reason to believe that Fuller committed a crime on the day of the
encounter, nor that Fuller did anything during the stop to give the Deputies
additional reasonable suspicion to continue detaining Fuller.  (*See id.* at 95, Pg. ID
220.)  Thus, Deputy Corrie had no reason to believe that Deputy Montgomery
could lawfully continue to detain Fuller and compel Fuller to submit to a pat down.
Accordingly, Deputy Corrie (like Deputy Montgomery) should have known that
Fuller was not disobeying a lawful order when he fled on foot.

initial seizure did constitute an intervening act that warranted a second seizure of the defendant.  In each of those cases, the defendant fled the allegedly-unlawful stop in a manner that gave the officers probable cause to believe that the suspect committed a new, distinct crime.  *See Allen,* 619 F.3d at 526 (defendant "attempt[ed] to escape from police by leading the officers on a high-speed chase," which "constituted a new, distinct crime"); *King*, 466 Fed. App'x at 486 (officer witnessed the defendant commit at least seven different violations – including operating a vehicle into oncoming traffic and exceeding 70 miles per hour in a 25 mile per hour zone – during a high-speed vehicular flight); *Castillo*, 2000 WL 1800481, at *6 (defendant used a motor vehicle to "recklessly" flee in apparent violation of several traffic laws); *Jefferson*, 1999 WL 519298, at *4 (defendant used force against officer while feeling an allegedly-unlawful stop in violation of Tennessee law).[14]  These cases do not apply here because Fuller's flight did not constitute a new crime (and did not give the Deputies probable cause to believe so).

---

[14]  The Sixth Circuit noted in *Jefferson* that Tennessee law prohibits the obstruction of an officer, "*even an officer who is unlawfully attempting to stop or arrest a person*."  1999 WL 519298, at *4 (emphasis added).  The officer in *Jefferson* therefore had probable cause that the defendant violated Tennessee law, regardless of the constitutionality of the original stop.  In contrast, and as discussed above, the Deputies lacked probable cause to arrest Fuller for violating M.C.L. § 750.81d(1) because that provision prohibits the obstruction of an officer only if that officer is engaged in *lawful* conduct.

36

The D.C. Circuit's recent decision in *United States v. Brodie*, 742 F.3d 1058 (D.C. Cir. 2014), confirms that flight on foot is *not* an intervening cause sufficient to attenuate the taint of an unlawful detention where the flight does not constitute a new crime.  In that case, two officers observed Eric Brodie ("Brodie") exit a house that belonged to a murder suspect in police custody.  Believing that Brodie might be an accomplice of the murder suspect, the officers decided to stop and identify him.  When one of the officers instructed Brodie to put his hands on a nearby car, Brodie initially complied.  However, a few seconds later, Brodie fled.  The officers eventually caught Brodie and discovered that he possessed three guns and crack cocaine.  After he was criminally charged, Brodie moved to suppress the weapons and drugs.  The Government argued that even if the officers illegally seized Brodie when he complied with their command to put his hands on the car, Brodie's flight purged the taint of the unlawful detention.  The D.C. Circuit disagreed:

> The government contends that Brodie's flight … w[as] [an] intervening circumstance[] that purged the taint.  As those events flowed directly from the seizure, however, it is hard to spot any attenuation.  *See United States v. Wilson*, 953 F.2d 116, 127 (4th Cir. 1991).  There are indeed a number of cases where courts have found attenuation in a defendant's response to illegal police conduct.  But in those decisions the court found that the defendant had committed a new crime, e.g., *United States v. Bailey*, 691 F.2d 1009, 1015-18 (11th Cir. 1982), or had at least fled in a manner posing serious risks to the public safety – typically a vehicular flight leading to a high-speed car chase, e.g., *United States v. Boone*, 62 F.3d 323, 324 (10th Cir. 1995).
>
> …

37

> Plainly we need not get into the soundness of these cases: Brodie fled on foot, and the manner of his flight in itself posed no incremental threat to anyone.
>
> …
>
> In short, the government has not met its burden to show attenuation between the illegal seizure and the discovery of the guns and drugs.

*Brodie*, 742 F.3d at 1063-64.

As in *Brodie*, the Government has not shown attenuation here. The Deputies' discovery of the evidence flowed directly from their unlawful detention of Fuller. Fuller's flight was not a new, distinct crime, and Fuller fled on foot, in a manner that did not pose an incremental threat. Under these circumstances, the taint of the unlawful detention was not purged by Fuller's flight.

### 3.    The Purpose and Flagrancy of the Illegal Conduct

The purpose and flagrancy of an officer's illegal conduct is "particularly" important to the fruit of the poisonous tree analysis. *Williams*, 615 F.3d at 669. "[T]he purposefulness factor is met when the unlawful action is investigatory, that is, when officers unlawfully seize a defendant 'in the hope that something might turn up.'" *Id.* at 670 (quoting *Brown*, 422 U.S. at 605). An officer's conduct is flagrant if it violates well-established legal rules. *See, e.g.*, *Gross*, 662 F.3d at 405-06. Also relevant is whether the illegal conduct was calculated "to cause surprise, fright, and confusion." *Brown*, 422 U.S. at 605. However, a finding of "purposeful and flagrant misconduct is not limited to situations where the police

38

act in an outright threatening or coercive manner." *Shaw*, 464 F.3d at 630 (internal punctuation omitted).

Deputy Montgomery's continued detention of Fuller was, by his own admission, investigatory. Indeed, Deputy Montgomery concedes that he continued to detain Fuller in order to investigate whether "there could be an outstanding warrant for Mr. Fuller based on [the] November 2013 [I]ncident." (Tr. I at 56, Pg. ID 181.) Deputy Montgomery's testimony makes clear that he continued to detain Fuller "in the hope that something" – i.e., an outstanding warrant – "might turn up." *Brown*, 422 U.S. at 605. Deputy Montgomery's conduct, therefore, was purposeful.

Moreover, Deputy Montgomery's continued detention of Fuller was flagrantly unlawful. Deputy Montgomery violated the long-settled rule that a police officer must end a *Terry* stop as soon as his reasonable suspicion evaporates. *See Davis*, 430 F.3d at 357. Deputy Montgomery's violation of this rule cannot be excused as good faith or mere negligence. At best, Deputy Montgomery *guessed* that the Prosecuting Attorney may have decided to charge Fuller *and* that a warrant for Fuller may have remained unexecuted. Guessing is not good faith.

Deputy Montgomery's continued detention of Fuller was especially reckless because he should have been aware that there was *no* warrant outstanding for Fuller. As noted above, long before Deputy Montgomery encountered Fuller on

Wiard Boulevard, the Prosecuting Attorney had both charged Fuller with assault and battery and dismissed that charge. Deputy Montgomery was the officer in charge of that case. (*See* n. 3, *supra.*) As the officer in charge, he had a clear responsibility to keep abreast of the proceedings. Indeed, an officer in charge is tasked with communicating with witnesses; serving subpoenas on the witnesses; and attending certain court proceedings. (*See* Tr. II at 22, 24; Pg. ID 293, 295.) And although Deputy Montgomery claims that he has no memory of playing any role in the Fuller case once it reached state court, there some reason to believe that Deputy Montgomery did, in fact, serve a witness subpoena in that case[15] – which should have signaled to Deputy Montgomery that Fuller's criminal case was in process and that no warrant was outstanding. Yet Deputy Montgomery had no idea that the charges against Fuller had been dismissed several months before he encountered Fuller on Wiard Boulevard in October of 2014. Deputy Montgomery's abject failure to learn and remember the status of *his own recent case* led him to violate Fuller's Fourth Amendment rights.

---

[15]  Deputy Montgomery testified that a representative of the Prosecuting Attorney recently informed him that he (Deputy Montgomery) had, in fact, served a subpoena on the alleged victim in Fuller's criminal case. (*See* Tr. II at 27, Pg. ID 298.) Deputy Montgomery testified that he had no memory of doing so. (*See id.*) However, Deputy Montgomery did not say for certain that he *did not* serve the subpoena, and serving a subpoena is consistent with what one would expect of the officer in charge of the case. (*See id.* at 24, Pg. ID 295.)

For all of the reasons discussed above, the evidence that the Deputies seized from Fuller is the fruit of the poisonous tree.

**F.      Suppression of the Evidence Is Appropriate**

"The fact that a Fourth Amendment violation occurred … does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009).  Exclusion is not appropriate "when the police act with an objectively reasonable good-faith belief that their conduct is lawful … or when their conduct involves only simple, isolated negligence." *Davis v. United States*, 131 S. Ct. 2419, 2427-28 (2011).  Suppression is warranted, however, when police misconduct is "deliberate, reckless, or grossly negligent." *Herring*, 555 U.S. at 144.   Thus, exclusion is an appropriate remedy when it "would result in appreciable deterrence" of police misconduct and "the benefits of exclusion outweigh its costs." *Davis*, 131 S. Ct. at 2436.  That is the case here.

As discussed in Part E, *supra*, Deputy Montgomery did not act in good faith when he continued to detain Fuller to check for an outstanding warrant even though he had no idea whether Fuller was the subject of a warrant.  Suppression here will serve to deter the police from detaining suspects (or prolonging detentions) based upon such unsupported speculation.

The Deputies' second seizure of Fuller – i.e., the seizure following Fuller's flight – was equally culpable.  Michigan law clearly established that it was not a

41

crime for a citizen to resist unlawful police conduct.  *See Moreno*, 814 N.W.2d at 629.   Any reasonable officer would have known that Deputy Montgomery's continued detention of Fuller was unlawful; that Fuller's flight was not a crime; and that the Deputies therefore lacked probable cause to seize Fuller based on his flight.

And if, somehow, the Deputies were not culpable, then the Washtenaw County Sheriff's Office (the "Sheriff's Office"), their employer, plainly was.  First, the Sheriff's Office was aware of the criminal charge against Fuller from the very day it was filed – because another deputy signed the criminal complaint as the complaining witness.   But, at least according to Deputy Montgomery, nobody bothered to tell him about the charge even though the charging document identified him as the officer in charge.  (*See* Tr. II at 20-21, Pg. ID 291-92.)  Second, if, as one would expect, the Sheriff's Office received communications from the state court regarding Fuller's case (such as notices for jury selection and notice of dismissal of the charges),[16] the Sheriff's Office failed to keep Deputy Montgomery informed about the status of the case.  Finally, the Sheriff's Office appears to have regularly allowed issued warrants to sit unexecuted for many months without ever telling the officers on the case that the warrants had been issued.  (*See* Tr. I at 57-

---

[16]   Deputy Montgomery testified that the Sheriff's Office ordinarily would receive important communications from the state court regarding the status of a case like Fuller's.  (*See id.* at 22, Pg. ID 293.)

42

58, Pg. ID 182-83.)  That is precisely why Deputy Montgomery says he believed that it was possible that a warrant may have been outstanding for Fuller without his knowledge.  (*See id.*)  The Sheriff's Office's practice thus forces deputies to guess about the status of the suspects they have investigated and leads to situations – like the one before the Court – in which a deputy feels the need to detain a suspect to dispel his uncertainty as to whether a warrant exists.  The practice, in short, recklessly creates a risk that deputies will unlawfully detain citizens.  That further supports suppression here.  *Cf. Herring*, 555 U.S. at 156 ("If the police have been shown to be reckless in maintaining a warrant system … exclusion would certainly be justified….").

Finally, declining to suppress here would create a perverse incentive for officers.  Not excluding the evidence seized from Fuller would reward Deputy Montgomery (and others in his position) for remaining ignorant of the status of their *own* cases and would encourage them to use their uncertainty as a basis for unlawfully detaining suspects. *See Gross*, 662 F.3d at 405 (expressing concern about resolving motion to suppress in a manner that would create "perverse incentives" for officers to detain suspects in order to check for outstanding warrants).  Suppression would deter that unreasonable conduct and would create the proper incentives for officers to keep abreast of the basic information concerning their own cases.

## **CONCLUSION**

For the reasons stated in this Opinion and Order, **IT IS HEREBY ORDERED** that Fuller's Motion to Suppress (ECF #14) is **GRANTED**.

<div style="margin-left:40%;">

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

</div>

Dated:  August 11, 2015


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 11, 2015, by electronic means and/or ordinary mail.

<div style="margin-left:40%;">

s/Holly A. Monda
Case Manager
(313) 234-5113

</div>